1050

JOSEPH A. FURROW ESTATE *v.* JULIUS H. JOLLY

5-5119 449 S. W. 2d 195

Opinion delivered January 26, 1970

*Mann & McCulloch*, for appellant.

*Harold Sharpe* and *Henry Wilkinson*, for appellee.

LYLE BROWN, Justice. Julius H. Jolly was awarded judgment for $9,500 in a personal injury suit against Joseph A. Furrow. The latter expired subsequent to the trial and his executor brought this appeal. The sole error asserted is excessiveness of the verdict.

For some five years appellee had been a route salesman for Independent Linen Company, servicing accounts in several cities in the Forrest City area. In January 1968 he was making a delivery to Tri-County Farmers Association in Brinkley. He had parked on Tri-County's parking lot, opened the rear door of his panel

truck, and was about to step up into the truck to obtain merchandise when Mr. Furrow's car backed into appellee. The impact pinned appellee's left leg between the back step of the truck and the bumper of the Furrow car. Appellee sustained a fracture of the larger bone and just above the ankle. Defendant below made no effort at the trial to establish any negligence on the part of plaintiff, Jolly. The evidence, summarized in the light most favorable to the jury award, is as follows:

1. *Julius H. Jolly.* He was twenty-eight years old and a high school graduate. At the time of the accident he was making $115 per week. He was hospitalized at Brinkley for fifteen days. It was five days before the swelling subsided; during that time a cast was applied to the back of the leg. Then a full cast was applied from the knee to the toes, that cast being worn for some twenty days. He was permitted to go to his home in Forrest City from the hospital at Brinkley and thereafter was treated by Dr. Collins in plaintiff's home town for reasons of convenience. An orthopedic specialist, Dr. Mitchell of Memphis, examined the patient on three occasions in 1968. The total medical expenses were $789. For fifteen weeks he was wholly incapacitated, during which time his wages would have been $1,725. Two months after the accident the knee-to-toe cast was replaced by a cast with a walking heel. After approximately one month that cast was removed and he was permitted to walk only with the aid of crutches. After three additional weeks he returned to work.

Jolly stated that the severe pain which he endured all during recuperation had subsided considerably but insisted at the time of trial, some fifteen months after the mishap, that it was routine for him to soak the foot in salt water after each day's work to reduce soreness and swelling. He complained of some stiffness each morning which could be relieved only by limbering exercises. He also complained that he had had to restrict

those playground activities which he formerly enjoyed with his children.

2. *Dr. Morgan Collins,* practicing physician in Forrest City. Appellee became his patient when the latter returned home from Brinkley. X-rays in March 1968 revealed a fracture of the distal tibia. The bone alignment was good and healing was normal. However, the calcium formation was insufficient to sustain normal weight-bearing. A walking heel was therefore fitted to the cast. One month later the cast was removed and the patient was advised to walk with crutches. Some fifteen weeks after the accident pain and swelling were present in the ankle and foot, not at the fracture site. The patient was advised he could return to work but to continue the use of crutches. As late as July 1968, appellee complained of continued swelling and pain, which were to be expected, because of calcium loss due to inactivity of the foot while in cast.

A final examination before the trial (fifteen months after the accident) revealed these findings: Patient continued to complain of some swelling and pain, particularly after a day's work. The doctor found muscular atrophy of three-quarters of an inch at the calf of the left leg; patient did not have full flexion and extension of the left foot, lacking five degrees of normal; the abnormality in flexion and extension would be noticeable to appellee when he was in such positions as squatting and lifting to a high degree. Dr. Collins concluded that those three conditions resulted in ten percent permanent functional disability to the lower left leg. He could not predict when his patient could reasonably be expected to be free of intermittent pain.

3. *Dr. B. G. Mitchell* of Memphis examined appellee on three occasions. He found the muscular atrophy as described by Dr. Collins; he explained that the continued swelling after a day's work was normal; the calcium content of the bone appeared considerably deplet-

ed, from which pain was to be expected; and it was his opinion that the continued pain and stiffness indicated a more complicated post-traumatic atrophy than usually found in this type of injury. The doctor could not predict when the pain would completely subside, stating that injuries in weight bearing extremities could produce pain and discomfort over a period of several years. He agreed with Dr. Collins as to the percentage of functional disability.

The elements of damages submitted to the jury were the nature and duration of the injuries, medical expenses, loss of wages, and pain and suffering. When we consider those elements (all of which have been summarized) along with appellee's substantial life expectancy and his vocation which required considerable physical activity, we cannot say the award evidences jury prejudice or that it shocks the conscience of the court. What we recently said in *Hartford Acc. & Ind. Co.* v. *Warren*, 246 Ark. 323, 438 S. W. 2d 31 (1969) is appropriate here:

> We have no means for accurate measurement of pain and suffering. Nor do we have any means of determining the exact impact of a 10 percent disability upon the future earnings and earning capacity of one whose livelihood is earned through physical activities. In view of the evidences of pain exhibited by Warren, his hospitalization and his disability, we are unable to say that the judgment for $12,000 evidences passion or prejudice on the part of the jury or that it shocks the conscience of the court. Consequently, we cannot reverse the judgment on this basis.

Appellant compares the award in this case with the amount appellee would have received for the same injury under the provisions of our workmen's compensation law and reasons that the verdict should, in light of the disparity, be reduced. The analogy is without

merit. The concepts of tort recovery and compensation benefits are so distinctly different that they cannot be compared favorably. For example, the object of tort recovery for an injured person is to restore the claimant to what he has lost, including disfigurement, pain, and mental anguish; a compensation plan proposes principally to give the claimant a sum (in addition to medical) "which, added to his remaining earning ability, if any, will presumably enable him to exist without being a burden to others." Larson Workmen's Comp. V. 1, § 2.50. The same authority, in § 2.00, summarizes the basic differences thusly:

> Workmen's compensation is fundamentally different from strict tort liability in its basic test of liability—work connection rather than fault; in its underlying philosophy—social protection rather than righting a wrong; in the nature of the injuries compensated; in the elements of damages; in the defenses available; in the amount of compensation; in the ownership of the award; and in the significance of insurance.

Affirmed.